UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                                       :
MARY ISUREAL                                           :        3:15 CV 221 (JGM)
                                                       :
V.                                                     :
                                                       :
CAROLYN W. COLVIN,                                     :
ACTING COMMISSIONER OF THE SOCIAL                      :
SECURITY ADMINISTRATION[1]                             :        DATE: MAY 31, 2017
                                                       :
------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER OR IN THE ALTERNATIVE MOTION FOR REMAND
FOR A HEARING, AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g)

seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying

plaintiff Disability Insurance Benefits ["DIB"] and Supplemental Security Income ["SSI"]

benefits.

I.  ADMINISTRATIVE PROCEEDINGS

On February 17, 2012, plaintiff, Mary Isureal, filed an application for DIB and SSI

benefits claiming that she had been disabled since August 31, 2008 (Certified Transcript

of Administrative Proceedings, dated May 23, 2015 ["Tr."] 347-50, 351-59) due to

diabetes, cellulitis of the foot and leg, high blood pressure, idioperipheral neuropathy,

hyperlipidemia, edema, high cholesterol, anemia, and neuropathy in the feet, legs and

hands. (Tr. 385; see also Tr. 247). Plaintiff's applications were denied initially on April 23,

2012 (Tr. 247-55, 256-64, 291-94, 295-98; see also Tr. 265-66), and upon

---

[1]At the time this action was filed, Carolyn W. Colvin was the Acting Commissioner of Social
Security.  On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

reconsideration on October 15, 2012. (Tr. 299-301, 302-04, 269-78, 279-88; see also Tr. 267-68).[2] On November 20, 2012, plaintiff filed a request for a hearing by an Administrative Law Judge ["ALJ"]. (Tr. 307; see also Tr. 308-17, 318-39, 340, 341-46). A hearing was held before ALJ Matthew Kuperstein on May 9, 2013, at which plaintiff testified. (Tr. 222-46). On August 13, 2013, ALJ Kuperstein issued his decision (Tr. 202-16) finding that plaintiff was disabled during the closed period of May 26, 2010 through June 7, 2012. (Tr. 209-13, 215-16). However, ALJ Kuperstein found that plaintiff was not disabled before and after that closed period: from plaintiff's alleged onset date of August 31, 2008 through May 25, 2010, and from June 8, 2012 through the date of the ALJ's decision. (Tr. 215-16). On August 30, 2013 and September 10, 2013, plaintiff requested a review of the hearing decision (Tr. 196-97) and plaintiff's attorney supplied additional evidence in November and December 2014. (Tr. 5-36, 37-187). On December 29, 2014, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

On February 17, 2015, plaintiff filed the complaint in this pending action (Dkt. #1), challenging defendant's partial denial of her disability claim, and on June 19, 2015, defendant filed her answer. (Dkt. #11).[3] On October 15, 2015, plaintiff filed her Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing and brief in support (Dkt. #17; see also Dkts. ##13-16), which was followed by defendant's Motion for an Order Affirming the Decision of the

---

[2]Plaintiff has been represented by counsel since November 19, 2012. (Tr. 306; see also Tr. 305, 289-90).

[3]Attached to defendant's answer is the administrative transcript, dated May 23, 2015, which is 1,581 pages long. Not surprisingly, given the length of the transcript, there is substantial duplication in the record.

Commissioner and brief in support on January 14, 2016. (Dkt. #22; see also Dkts. ##19-21, 23).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing (Dkt. #17) is **granted in part**, to the extent that it seeks remand to the Commissioner, and is **denied in part**, to the extent that it seeks an immediate award of benefits; defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #22) is **denied**.

## II. FACTUAL BACKGROUND

### A. HEARING TESTIMONY AND ACTIVITIES OF DAILY LIVING

Plaintiff was born in 1964, and was forty-eight at the time of the administrative hearing. (Tr. 228). Plaintiff testified that she weighed 296 pounds and that she had gained about forty pounds between August 2008 and the hearing because she was not "able to move around and do like [she] normally do[es]." (Id.).  At the time of the hearing, plaintiff lived alone in a first floor apartment in Norwalk, Connecticut, and had been doing so for more than one year. (Tr. 230-31). She is not married and does not have children. (Tr. 230). Plaintiff has a driver's license but has not driven since 2010 because she "[could not] operate the clutch" of her manual car and "didn't trust [her] leg giving out on [her] and causing an accident." (Tr. 231). Plaintiff relies upon friends, Norwalk Transit and the Department of Social Services for transportation. (Id.).  Plaintiff has two years of college education and vocational training as a certified nursing assistant ["CNA"]. (Tr. 232).

Plaintiff was a CNA for a short period in 1998; from 1998 to 2003, she worked for a postage company by telephone in which she "helped technicians put meters in, and take meters out over the phone, . . . [and] helped customers refill their meters via the phone

line." (Tr. 232-33). Plaintiff was let go when the company laid off one-third of its workforce. (Tr. 233). Plaintiff testified that all the sitting required by this job was "very irritating" because "you were basically chained to your seat," with only "[fifteen] minute breaks, and a half an hour lunch," which caused her to experience "[l]eg[] swelling, pain, [and] hemorrhoids, because [she] was sitting." (Id.).

From 2005 to 2007, plaintiff worked as a home health aid assisting patients with living activities. (Id.). In 2007, plaintiff worked for Answer Connecticut, a telephone answering service for doctors and businesses. (Tr. 233-34). Plaintiff "tr[ied] for about a week, give a minute, take a minute, to do some phone service, but [she] wasn't able to do that." (Id.). According to plaintiff, there was too much sitting and "the calls would pop in. It wasn't like you were pushing a button to take the call. You just had your headsets on, you finish the call, you release, and the next caller would be on the line." (Tr. 234). Plaintiff was fired or laid off after approximately one week because "[t]he supervisor . . . said [plaintiff] wasn't like taking the calls fast enough. [Her] typing was diminished so [she could not] really type fast enough to get all the information in, in like a minute, or you know in less than a minute like they wanted." (Tr. 236-37).

In 2008, plaintiff worked in home healthcare for Quality Care but she "stayed sick[.]" (Id.). Plaintiff testified:

> [Y]ou know my left leg was swelling up and I kept getting fevers, and just basically couldn't work. And . . . they couldn't tell me why, they just told me that my lymphs [sic] [were not] retrieving [sic] like they should. . . so that's why the fluid was building up, and then the leg would get infected. Then I would have to go, you know rest on it, or go in the hospital and get some antibiotics, and you know depending on how fast, how far it would have gone.

(Id.). Plaintiff stopped working when she "just realized that [she] was putting [herself] through something that [she] couldn't handle[,]" adding that "[her] patients couldn't rely

on [her]. [She] couldn't be trusted with transfers[,]" and was concerned about banging her leg and "open[ing] [it] up." (Tr. 237-38).

Plaintiff moved to Honey Hill Rehab and Nursing Center, a skilled nursing facility, due to an infection on her toe. (Tr. 238). Plaintiff presented to the hospital when she found discharge on her sock; because plaintiff could not rotate her foot to see the underside, she did not find the infection until it had worsened. (Id.). By that point "[t]he infection had taken toll of [her] toe, even though they were able to save it [f]or a little while." (Id.). Plaintiff was non-weight-bearing "for like [ten], [eleven] months," and in order to clean the wound on her foot she had "approximately six[]" surgeries. (Id.). Plaintiff testified that residents of Honey Hill were not permitted to work, and she was non-weight-bearing during much of that time. (Tr. 239).

Plaintiff does not "walk too well[,]" "stumble[s] a lot[,]" and her legs hurt her "practically continuously[,]" which prevents her from "walking as well as [she] should." (Id.). She was prescribed a cane and has used a walker, but pushing the walker "vibrated in [her] arms so badly" that she was unable to use it due to neuropathy in her hands. (Id.). Plaintiff has a shower seat and shower bars, and a recliner so that she does not stay in bed and "can actually . . . pull [her] legs up, [and] take the stress off of them." (Id.). Plaintiff testified that the pain in her legs, which is nearly constant, ranges anywhere from a four to a ten on a scale of ten, and that she is "[n]ot really" able to treat it with medication. (Tr. 239-40). Plaintiff testified:

> If I take Tylenol, I'm afraid for my kidneys. If I take Vicodin, which every now and then when it gets unbearable, and I need sleep, I'll take the Vicodin. That way I can get at least four hours of sleep. You know that's when I'll take it cause I can't handle the constipation that the Vicodin, you know, gives me. And, you know, Vicodin has Tylenol in it so I'm still afraid for it.

(Tr. 240). Plaintiff explained that she was afraid because her doctors told her to be careful with her kidneys and to avoid Tylenol and medications with acetaminophen. (Id.).

Plaintiff testified that she has headaches that wake her up so often that "there's not a full week that . . . can go by without at least two, maybe three occurrences." (Id.). The headaches sometimes last all day, into the next day, and their length is "hard to even measure sometimes because it's ongoing, because it could stop for a while," and then suddenly her head is "right back pounding." (Tr. 240-41).

Plaintiff testified that in August 2008, she could sit for "roughly [twenty] minutes, maybe a half hour[,]" and at the hearing she could sit for "[a]bout [fifteen] to [twenty] minutes[]" before she had to stand. (Tr. 234-35).

Plaintiff testified that she struggles to use her hands, explaining "[t]hey cramp up a lot. There's pain in them.  I have neuropathy in my hands as well. They said the left one, the first time they told me about it, the left one had a full mitten, and the right one was three quarters of a mitten." (Tr. 229). Plaintiff "get[s] weak in [her] hands" and drops things, and "[a]ctual dexterity is not there anymore." (Id.). Plaintiff added that she used to type with "ten key," but "now it's diminished to basically pecking." (Id.).  According to plaintiff, "[n]obody really ha[s] an explanation because . . . medical doctors [] would say you [are] too young for this, or you [are] too young for that to be taking place, but it was actually taking place." (Tr. 229-30).

Plaintiff has difficulty sleeping such that she goes to bed around 10:30 p.m. and will "usually always awake by 12:30, 1:00[]" and remains awake until "maybe 4:00 or 5:00, sometimes 6:00 in the morning." (Tr. 235). Plaintiff might "doze off" again and wake up when her aide comes to assist her with daily activities. (Id.). Plaintiff has had an aide on a daily basis since she left the nursing home on February 22, 2012. (Id.).

Plaintiff cannot perform most household chores, such as sweeping, mopping, or cleaning the bathtub. (Id.). She can dust items that are "on [her] level," but she cannot bend over to "get[] in the crevices and cracks[.]" (Tr. 236). Plaintiff testified that in 2008, her friends and an ex-boyfriend would help her with chores "[o]nce[] [or] twice a week." (Id.). Plaintiff "can't walk too far, too long[]" because she becomes weak, and her legs feel "like lead[.]" (Tr. 241). Plaintiff starts to feel weak after standing for fifteen to twenty minutes without assistance, and added that she needs to lean on the shopping cart for support when grocery shopping. (Id.). Plaintiff shops for groceries about once a week with the assistance of her aide.  (Id.). At Honey Hill, plaintiff took brief leaves of absence when a friend would bring her to appointments, shoe fittings, or a store to shop for personal items. (Tr. 243). Plaintiff would also be picked up by Deacon Alexander to attend church. (Id.).

Between 2008 and 2010, plaintiff went to the hospital only as "the last resort[,]" because "they couldn't tell [her] what was wrong with [her]." (Id.). Plaintiff testified:

> They could only give me a round, like I was telling you when they told me that my lymphs wasn't functioning well. But that [is] not telling me what [is] going on with the leg, why [is] it getting an infection, you know, why [is] it warmer than the other one? You could tell me that the, you know, you couldn't tell me that this is what it's all about. So I figured if laying here for two days made me, I could get better and get up on my own, the[n] why go and take time out at the hospital? And they gonna keep you a week, regardless.

(Tr. 243-44). Plaintiff was afraid that the necrotizing fasciitis returned and the doctors would "check MRI's and all of that to see what was going on. Or if it was clots had developed or something like that. Because sometimes the pain would be so severe, and then knowing that that's your history. You're afraid that this is what's happening again." (Tr. 244).

B. MEDICAL RECORDS

The medical records in the administrative transcript begin in May 2007 (Tr. 484) and cover a period of more than seven years, through November 2014. (Tr. 14-18).[4] Plaintiff alleges that she became disabled on August 31, 2008, and ALJ Kuperstein found that plaintiff was disabled for a closed period of time from May 26, 2010 through June 7, 2012. The vast majority of plaintiff's medical records do not relate to plaintiff's conditions during the relevant time period, do not discuss plaintiff's alleged impairments, or are duplicative. While the Court has reviewed the entirety of the administrative record, this decision will focus primarily on plaintiff's medical records from the two time periods for which plaintiff challenges defendant's determination: from the date plaintiff alleges onset of disability on August 31, 2008 through May 25, 2010, and from June 8, 2012 through her date last insured on June 30, 2013. Similarly, this decision will not address medical records during the relevant time that do not relate to plaintiff's alleged causes of disability.[5] However the Court will discuss any additional records that may shed light on her condition during the relevant times.

---

[4]A good number of the hand-written pages of the medical record are largely illegible. See, e.g., Norwalk Hospital Progress Notes (Tr. 579, 1156, 1185, 1190, 1427-28, 1562); Norwalk Hospital Emergency Department Record (Tr. 1214-15); Honey Hill Annual Physical Notes (Tr. 586-92, 883, 885); Honey Hill Progress Notes (Tr. 887-93); Daily Skilled Nurses Notes (Tr. 885); Physician Order Sheet from Dr. Martin Perlin (Tr. 766, 768, 776, 778, 780, 788, 800, 802).

[5]See, e.g., Tr. 176-77 (mammogram); 433 (unremarkable chest X-ray); 538, 547-51, 1180-83, 1203 (gynecological exam); 552 (breast cancer screening); 558 (routine urinalysis); 485-535, 559-64, 568-73, 580-81, 602-10, 684-87, 712, 714, 722, 1163-71, 1187-88, 1206-08, 1229-31, 1239-43, 1270-81, 1292-95, 1307-08, 1316, 1320, 1324, 1347, 1366-69, 1375-1403, 1415-25, 1494-1554  (uninterpreted lab reports); 1151 (pap smear); 141-42 (abdominal hysterectomy due to ovarian malignancy); Tr. 593-96, 913, 915, 917, 919 (psychiatric evaluations).

### 1. MEDICAL RECORDS PRE-DATING PLAINTIFF'S ALLEGED DISABILITY ONSET DATE

Plaintiff's earliest medical records reflect an admission to Norwalk Hospital on May 6, 2007 (Tr. 479-85) for left groin drainage with induration and swelling, fatigue, fever, chills, and nausea. (Tr. 479, 483). Dr. Brenda Urbina-Reyes, an infectious disease specialist, opined that plaintiff looked extremely fatigued and her groin had "left area cellulitis with blisters, which look[ed] like they are filled with blood." (Tr. 480). Dr. Urbina-Reyes diagnosed plaintiff with groin cellulitis with an elevated erythrocyte sedimentation rate and leukocytosis, and prescribed plaintiff broad spectrum antibiotics. (Id.). CT scans of plaintiff's abdomen and pelvis were consistent with cellulitis. (Tr. 482, 1405-06).

Although plaintiff was responding well to antibiotics, an eschar in plaintiff's pubis opened and a significant amount of pus was identified. (Tr. 473-74).  On May 16, 2007, plaintiff underwent an operative procedure to excise necrotizing fascia to the anterior rectus fascia. (Id.). Plaintiff's postoperative diagnosis was necrotizing fasciitis bilateral flanks, pannus to the umbilicus, left thigh to mid anterior thigh, suprapubic and labia to labia. (Id.). In the following days, plaintiff's necrotizing fasciitis was debrided; she tolerated the procedure well and was in good condition. (Tr. 465, 467-68, 470-72). Subsequent radiological reports found no evidence of deep venous thrombosis ["DVT"]. (Tr. 461, 463, 482, 1408-10).

### 2. MEDICAL RECORDS BETWEEN PLAINTIFF'S ALLEGED ONSET DATE AND THE ALJ'S CLOSED PERIOD OF DISABILITY

On September 23, 2008, plaintiff presented to the Norwalk Hospital Emergency Room (Tr. 443-60), complaining of a left-sided pus-discharging abscess on her buttock that appeared one and one-half weeks earlier, with low-grade fever, chills and rigors. (Tr. 443, 446. See also Tr. 454, 1299). Plaintiff reported that her diabetes had been poorly

controlled since she lost her health insurance in 2007, and she "had periods of not even taking any of her blood sugar medications. She ha[d] not been able to check her blood sugar because she d[id] not have money to pay for the equipment." (Tr. 451. See also Tr. 443, 446, 1297). Plaintiff had a one by one-half inch discharging abscess on her left buttock, a large one by one-half inch lymph node in her left inguinal area, and "[l]eft below swelling, warmth, and mild erythema, with tenderness [and] [g]ood peripheral pulses." (Tr. 444). Plaintiff was admitted to the hospital, and DVT, myositis, and osteomyelitis were ruled out. (Tr. 444, 447, 450, 454-55, 457, 1299-1301, 1304-05, 1372-73). Dr. Urbina-Reyes performed an Infectious Disease Consultation, and observed that plaintiff's ultrasound showed enlarged lymph nodes. (Tr. 451, 1297-98). Dr. Urbina-Reyes diagnosed plaintiff with left thigh cellulitis and abscess due to poorly controlled diabetes, and suspected that plaintiff's elevated white blood cell count was due to an occult abscess. (Tr. 452-53, 1299). Dr. Urbina-Reyes opined that plaintiff most likely had a polymicrobial infection, including anaerobes, and treated plaintiff with antibiotics. (Id.). On September 24, 2008, plaintiff underwent a CAT scan (Tr. 458, 1370), ultrasound (Tr. 457, 1372-73), and ECG (Tr. 460; see also Tr. 454-55, 1457-58, 1299-1301). Two days later, an MRI was performed on plaintiff's lower extremity. (Tr. 449, 1371). Plaintiff was prescribed antibiotics and she improved clinically and symptomatically. (Tr. 444, 447, 1301, 1304-05). Plaintiff was discharged on September 27, 2008. (Id.).

Nine months later, on July 5, 2009, plaintiff was admitted to Norwalk Hospital (Tr. 439-42), complaining of steady swelling in her left lower leg, an inability to find a painless resting position for her leg, and warmth over the area. (Tr. 439). Dr. Kirsten Marcus reported that plaintiff's leg was not tender, but that plaintiff was "in mild distress, [and] unable to move the left lower leg because of pain." (Tr. 439-40). Dr. Marcus observed

that plaintiff's left leg had an increased diameter compared to the right leg, with a limited range of motion. (Tr. 440). Plaintiff was admitted for left lower cellulitis and prescribed intravenous antibiotics. (Id.). During her hospital admission, plaintiff's swelling, erythema, and pain markedly improved, and she was discharged on antibiotics and follow up care. (Tr. 440-41).

### 3. MEDICAL RECORDS DURING THE ALJ'S CLOSED PERIOD OF DISABILITY

Plaintiff's closed period of disability, as found by the ALJ, included two hospital admissions. On May 26, 2010, the first day of the closed period, plaintiff was admitted to Norwalk Hospital (Tr. 415-38, 1250-56), complaining of edema and ulceration on the bottom of her left foot. (Tr. 415, 431, 1251-52). Upon physical examination, plaintiff's

> [l]eft lower extremity [was] swollen and slightly warmer than the right lower extremity. [The] [d]orsal surface of the first metatarsal base of the left foot showed an indurated area of 3 to 4 cm of circumference around a small ulceration of 2 mm in diameter. . . . [Plaintiff] ha[d] poor sensation in the bilateral feet that is at baseline.

(Tr. 416). Plaintiff's ultrasound was negative for DVT and she was prescribed antibiotics. (Tr. 417). An infectious disease consultation by Dr. Paolo Pino noted a history of necrotizing fasciitis, but that plaintiff "has not received typical medical care for these problems." (Tr. 435, 1253). Dr. Pino observed that plaintiff had foot pain, full range of motion in all joints, diminished pulses in the extremities, and diminished sensation. (Tr. 436-37, 1254-55). Dr. Andrew Rice, a podiatrist at Norwalk Hospital, opined that plaintiff had cellulitis of the left lower extremity with open ulceration and likely necrotic tissue present with infection; he informed plaintiff that there was a high risk for lower extremity limb loss. (Tr. 431-32, 1251-52).

Dr. Rice performed an "incision and drainage of the left foot wound and extensive debridement in the [operating room] with removal [of] necrotic tissue as well as graft

placement." (Tr. 416-17, 428-30, 1262-63). Plaintiff was discharged from the operating room in satisfactory condition. (Tr. 429, 1262-63). Dr. Taras Kucher, a vascular surgeon, opined that the cause of plaintiff's leg infections likely was poorly controlled diabetes. (Tr. 426-27). Plaintiff was prescribed long term intraveneous antibiotics and underwent multiple debridements of the left foot, as well as excision of the flexor hallux longus due to drying of the tendon. (Tr. 416-17, 420, 1260-61). Plaintiff's elevated blood pressure was treated with Diovan 80 mg p.o. daily, and her insulin was increased to Humulin 40 units subcu q. a.m. and 20 units subcu q. p.m. (Tr. 417). Due to her hyperlipidemia, plaintiff was continued on Simvastatin 20 mg p.o. daily. (Id.). Plaintiff was non-weight-bearing on the left lower extremity, and plaintiff required outpatient physical therapy and short term rehabilitation to increase her mobility. (Id.). On June 18, 2010, plaintiff was discharged to Honey Hill for short term rehabilitation and intraveneous antibiotic therapy. (Tr. 415, 417).

At Honey Hill, plaintiff had physical and occupational therapy to assist with activities of daily living ["ADLs"] and improve her functional mobility. (Tr. 613-15, 617-18, 625, 628-34, 806, 808, 810, 814, 816, 828, 834, 836, 838, 840, 842, 848, 850). At times, plaintiff experienced pain in her lower left extremity (Tr. 624, 634, 826, 848) and was unable to negotiate stairs safely (Tr. 624, 826), but plaintiff felt she was getting stronger (Tr. 636) and had good potential to achieve her rehabilitation goals. (Tr. 631, 840). By September 2010, plaintiff had fair standing balance and tolerance, and independent bed mobility, sitting balance, grooming, feeding, and dressing. (Tr. 616, 620, 622-23, 812, 820, 824, 856). Plaintiff required minimal assistance bathing and showering, and decreased balance and standing tolerance were identified as her barriers to recovery. (Tr. 623). Occupational and physical therapy notes from this period (Tr. 619, 818) indicate

that plaintiff could ambulate independently with a walker (Tr. 611) and had no complaints. (Tr. 624).

In September 2010, Dr. Sandra Wainwright, a wound care specialist, reported that plaintiff had no pain and could begin walking, and the ulcer was "showing remarkable signs of healing." (Tr. 575-76, 1153-54). On October 19, 2010, plaintiff presented to Dr. Andrew Kolodziej, an internist, who reported that plaintiff had some sensory loss, was not following an appropriate diet for her diabetes, was not performing self foot exams, and was not exercising regularly, but was checking her blood sugar at home. (Tr. 540-41, 1195-96).

In February 2011, plaintiff began using a shoe insert to decrease force on her left foot, a walker to limit weight bearing, and compression stockings below the knee. (Tr. 601). A quarterly rehabilitative screening form, dated June 8, 2011, records that plaintiff was steady at all times when moving from seated to standing position, walking, turning around and facing the opposite direction while walking, moving on and off the toilet, and surface to surface transfer. (Tr. 612). Plaintiff had no impairments in her upper or lower extremities, and normally used a walker as a mobility device. (Id.). On July 19, 2011, Kandree Hicks, Family Nurse Practitioner, reported that plaintiff was not in any pain or acute distress; she was alert; her skin was normal with no rashes, lesions or bruising; and she had normal mobility, full joint motion, appropriate mood and affect, and no edema. (Tr. 547-51).

On August 1, 2011, plaintiff presented to Dr. Lavinia Mitulescu, a cardiologist at Norwalk Community Health Center (Tr. 565-67, 1160-62), and reported that her legs, especially her left leg, were swollen, and the inguinal area was more tender than usual. (Tr. 565, 1160). Dr. Mitulescu diagnosed plaintiff with left and right pretibial edema; she

opined that plaintiff's diabetes mellitus was "not very well controlled[,]" and plaintiff was experiencing stress due to her expected discharge from Honey Hill. (Tr. 566, 1161). Dr. Mitulescu encouraged plaintiff to monitor her blood sugar regularly, maintain proper foot care, and lose weight. (Tr. 567, 1162).

On September 1, 2011, Dr. Martin Perlin, an internist, examined plaintiff. (Tr. 137-40, 649-51, 726-28, 1351-53, 1555-57). Plaintiff presented with complaints of pain in her left arm from the shoulder to the wrist, neuropathy in her left leg from knee to foot, and pain in the left upper breast area. (Id.). Plaintiff did not have any new lesions or rash, shortness of breath, or anxiety and depression; she was cooperative and well groomed, not in acute distress or sickly, and had normal posture and gait. (Id.). Plaintiff had no edema and normal strength and tone in all four extremities. (Tr. 138, 650, 659, 727, 1352). Laboratories collected on September 1, 2011 listed the associated diagnosis as hidradenitis. (Tr. 650-51, 659-60, 727-28, 1352-53).

As described infra, Dr. Perlin treated plaintiff regularly through October 2014 (Tr. 43-45); however, except for the description of plaintiff's presenting complaint, there is nearly no difference in Dr. Perlin's examination notes.  For some visits, Dr. Perlin entirely omitted examination notes.[6]  Plaintiff presented to Dr. Perlin on March 6, 2012 (Tr. 131-33, 643-45, 720-22, 1345-47, 1452-54) with a foot problem; all listed symptoms, including new lesions and rash, shortness of breath, swelling of extremities, anxiety, and depression, were marked "[n]ot [p]resent[.]" (Tr. 131, 643, 720, 1345, 1452). Plaintiff was well groomed, not in acute distress or sickly, well nourished, and had normal posture

---

[6] At times, Dr. Perlin documented visits from plaintiff but failed to include any examination notes. Plaintiff has recorded interactions with Dr. Perlin on February 24 (Tr. 135) and five days later on February 29. (Tr. 134). Each of these "Physical Report[s]" included plaintiff's age and an "Assessment and Plan" for diabetes mellitus, type I.

and gait. (Id.). Dr. Perlin noted nothing abnormal in the physical exam, and he specifically noted that plaintiff had no edema, with normal strength and tone in her upper and lower left and right extremities. (Tr. 131-32, 643-44, 655, 720-21, 1345-46, 1452-53). Dr. Perlin's "Assessment & Plan" listed diagnoses of diabetes mellitus, type I, and peripheral vascular disease. (Tr. 132, 644, 721, 1346, 1453). Lab results associated with this visit attributed particular results to diabetes mellitus, type I and peripheral vascular disease. (Tr. 131-32, 644-45, 721-22, 1346-47, 1454). Plaintiff presented to Dr. Perlin four more times in March 2012, but there are no examination notes associated with any of these visits.[7]

Plaintiff subsequently presented to Dr. Perlin three times in April 2012 for follow up of type I diabetes: on April 2 (Tr. 124-26, 713-15, 1338-40, 1455-56), April 9 (Tr. 122-23, 711-12, 1336-37, 1458-60), and April 13 (Tr. 120-21, 709-10, 1334-35, 1461-62). On May 11, 2012, plaintiff presented to Dr. Perlin with "a foot problem." (Tr. 118-19, 707-08, 1332-33, 1463-64). The examination notes for each of these visits duplicate the March 6, 2012 examination findings: Dr. Perlin described all symptoms as "not present"; he did not note any abnormalities in the physical exam; and he opined that plaintiff was not in acute distress or sickly, had no edema, had normal gait and posture, had normal strength and reflexes, and had normal strength and tone in all four extremities. (Tr. 118-25).

Plaintiff was admitted to Norwalk Hospital between March 13 and March 21, 2012 (Tr. 667-83, 1222-36) for left foot oozing, increased pain, swelling, and redness. (Tr. 667, 680). Dr. Susan Herson, plaintiff's attending physician, noted that plaintiff was a known

---

[7]Plaintiff has recorded interactions with Dr. Perlin on March 8 (Tr. 130), March 9 (Tr. 129), March 23 (Tr. 128), and March 26 (Tr. 127). These records only include an "Assessment and Plan" for diabetes mellitus, type I (Tr. 130, 128, 127), or hypertension (Tr. 129).

diabetic and morbidly obese, with a history of hypertension, suboptimally controlled diabetes, chronic kidney disease, and dyslipidemia, and a prior history of left plantar first metatarsal deep abscess. (Tr. 667, 680-82, 1222, 1224-26). Dr. Shayiq Ahmadzia, an internist, recorded that plaintiff was alert, oriented, and not acutely distressed, but her left foot was warmer than her right, and she had decreased sensation bilaterally. (Tr. 680-82, 1224-26). Plaintiff had no significant pitting edema, dorsal surface of the first metatarsal indurated, erythematous, three centimeter callous formation, and white drainage, which was slightly malodorous. (Id.). Dr. Ahmadzia opined that plaintiff's foot was suspicious for osteomyelitis. (Id.).

Plaintiff was prescribed Unasyn and Vancomycin and underwent an MRI of her left foot to evaluate for osteomylitis. (Tr. 668, 678-79, 1226, 1235-36). The MRI findings revealed progressive large soft tissue phlegmon at the plantar aspect of the left foot centered at the level of the first metatarsophalangeal joint and extending both proximally and distally, and interval development of mild bone marrow edema and enhancement throughout the medial and lateral sesamoids. (Tr. 678-79, 1235-36). On March 16, 2012, Dr. Marissa DeMatteo-Santa, D.P.M., a podiatrist, performed a left foot debridement of all nonviable soft tissue and bone with left hallux, or great toe, amputation due to left foot infection with osteomyelitis. (Tr. 670-71, 696-97, 746-47, 1223-24, 1227-28). After surgery, Dr. Eliot Husarsky performed an infectious disease consultation and opined that plaintiff had significant fatigue but no fevers or chills, no rashes, no psychological complaints or other joint complaints, appropriate mood and affect, and was able to move all of her joints without difficulty. (Tr. 672-75, 1219-22). Dr. Husarsky diagnosed plaintiff with osteomyelitis, chronic diabetic ulcer, and diabetes, with a history of methicillin-resistant Staphylococcus aureus. (Tr. 674, 1221). Dr. Husarsky discontinued plaintiff's

16

Unasyn prescription and awaited pathology cultures to determine the course of antibiotic treatment. (Tr. 674-75, 1221-22. See also Tr. 676-77). Plaintiff's Vancomycin prescription was discontinued on March 21, and she was seen by physical therapy and discharged home with daily wound changes and use of a rolling walker. (Tr. 668, 680-82, 1223). Plaintiff was instructed to continue physical therapy and glucose monitoring at home. (Tr. 668, 1223).

Dr. DeMatteo-Santa examined plaintiff on March 23, 2012 at Arch Foot Care for follow-up care of her left foot. (Tr. 689-90, 738-39). Plaintiff reported moderate numbness and burning pains in her feet, and Dr. DeMatteo-Santa noted that pedal pulses dorsalis pedis and posterior tibial were weakly palpable bilaterally due to lower extremity edema; ranges of motion to the ankle, subtalar and midtarsal joints were within normal limits without pain or crepitus; and manual muscle testing was 5/5 dorsiflexion, plantarflexion, inversion, and eversion bilateral and symmetric. (Id.). Dr. DeMatteo-Santa instructed plaintiff on partial weight-bearing to her left heel with a surgical shoe and instructed her to use a walker at all times. (Id.).

Plaintiff returned to Arch Foot Care for weekly follow-up. One week later, Dr. DeMatteo-Santa noted that the ulceration of plaintiff's left great toe was improving (Tr. 690, 739); on April 6, 2012, plaintiff's left great toe ulceration continued to improve, plaintiff denied drainage, and plaintiff was instructed to continue partial weight-bearing with her surgical shoe and walker (Tr. 691, 740); on April 13, 2012, plaintiff felt her feet were more swollen than normal but acknowledged she had eaten bacon the night before and sausage that morning (Tr. 692, 741); on April 27, 2012, plaintiff's ulceration was still improving, she denied drainage, and was ambulating with a surgical shoe and walker (Tr. 693, 742); on May 4, 2012, Dr. DeMatteo-Santa opined plaintiff's left great toe ulceration

had resolved, and plaintiff reported that her wound care nurse was unable to see the ulcer on her visit that week. (Tr. 694, 743).

## 4. MEDICAL RECORDS POST-DATING THE ALJ'S CLOSED PERIOD OF DISABILITY

On June 8, 2012, Dr. DeMatteo-Santa noted that plaintiff's left great toe ulceration had resolved, plaintiff had no complaints, and was using lotion for a callus on her foot. (Tr. 695, 744). However, less than six weeks later, on July 18, 2012, Dr. DeMatteo-Santa opined that plaintiff "should not perform any activity involving standing, walking, lifting, carrying or bending. She is status-post amputation of the left great toe due to complications from diabetes and is at high-risk for further complications/amputations." (Tr. 745).

Plaintiff continued to present to Dr. Perlin, but the physical examination notes duplicate those of previous visits; accordingly, the Court will only discuss Dr. Perlin's physical examination findings to the extent that they differ from those of previous visits.[8] On June 8, 2012, plaintiff presented with edema (Tr. 114-15, 703-04, 1328-29, 1465-66) and lab samples record the associated diagnosis as diabetes mellitus, type I. (Tr. 116,

---

[8]The following physical examination findings should be assumed, unless otherwise noted: review of systems described all listed symptoms as "not present"; plaintiff was not in acute distress or sickly; no abnormalities were noted in the physical exam; plaintiff had normal posture and gait; she had no varicose veins or edema; all her muscles and reflexes were normal; and she had normal strength and tone in all four extremities.

705, 1330, 1467).[9] On August 2, 2012 plaintiff presented to Dr. Perlin with hyperlipidemia. (Tr. 108-09, 1322-23, 1468-69).[10]

On August 24, 2012, plaintiff presented to the Norwalk Hospital Emergency Department (Tr. 1206-15) for lower right side flank pain. (Tr. 1211). A CT scan of plaintiff's abdomen and pelvis revealed that the unenhanced liver, spleen, pancreas, uterus, urinary bladder and adrenal glands were unremarkable. (Tr. 1209-10). Testing revealed small calcified gallstones layering the gallbladder, a few prominent and mildly enlarged left inguinal lymph nodes which were likely inflammatory, and mild degenerative changes in the spine. (Id.). There was no secondary evidence of obstructive uropathy; mild bilateral perinephric stranding was nonspecific, and possibly chronic. (Id.). Prominent and mildly enlarged left inguinal lymph nodes were nonspecific and likely, but not definitely, inflammatory. (Id.). Focal low density area in the liver, adjacent to the falciform ligament, was most likely due to focal fatty infiltration. (Id.). An ultrasound was performed on plaintiff's right lower extremity due to swelling and edema, but found no DVT. (Id.). Plaintiff was discharged home that day with instruction to follow-up with Dr. Perlin. (Tr. 1211-12).

---

[9]Plaintiff returned to Dr. Perlin again on both June 18 and 19, but neither of these physical reports have any examination notes. The report for June 18, 2012 reflected that plaintiff was prescribed hydrocodone-acetaminophen 5-325 MG, 1 tablet every eight hours as needed, for peripheral neuropathy. (Tr. 113, 702). The record for June 19 lists diabetes mellitus, type I in the Assessment and Plan, and a current plan to start plaintiff on an insulin syringe 29G x 1/2"1 ML, 1 Misc as needed. (Tr. 112).

[10]Plaintiff returned again to Dr. Perlin on August 21, 2012 but there were no examination notes. Diabetes mellitus, type I was written in the Assessment and Plan. (Tr. 107). The Current Plans were to restart plaintiff on Simvastin 20mg daily, and restart plaintiff on hydrocodone-acetaminophen 5-325 MG, 1 tablet every eight hours as needed. (Id.).

On September 7, 2012, plaintiff returned to Dr. Perlin with peripheral vascular disease and hypertension. (Tr. 104-05, 1318-19, 1471-72).[11] On October 9, 2012, plaintiff returned to Dr. Perlin for peripheral vascular disease, hypertension and diabetes. (Tr. 100-02, 1314-16, 1474-75).[12]

Plaintiff presented to Norwalk Hospital on November 8, 2012 for diabetes mellitus foot care, where Dr. DeMatteo-Santa noted that plaintiff had no complaints and should return in nine weeks. (Tr. 1434-35, 1565-66).

Dr. Perlin continued treating plaintiff: on November 9, 2012 plaintiff presented for peripheral vascular disease, hypertension and peripheral neuropathy (Tr. 97-98, 1311-12, 1477-78); on December 7, 2012, plaintiff returned for hyperlipidemia with hypertension (Tr. 94-96, 1479-80); and on January 3, 2013, plaintiff returned for follow up of type I diabetes with hypertension. (Tr. 91-93, 1482-83).

On January 23, 2013, Dr. Barinder Mahal, a physiatrist, diagnosed plaintiff with right plantar fasciitis, facet lumbago, diabetes mellitus, and mechanical lower back pain, and noted that plaintiff wanted to proceed conservatively. (Tr. 1559, 1567-68.) Dr. Mahal performed physical therapy exercises on plaintiff. (Tr. 1559).

Eight days later, plaintiff presented to Dr. Perlin with hypertension and hyperlipidemia. (Tr. 88-90, 1485-86). Plaintiff returned to Norwalk Hospital on February 28, 2013; progress notes recorded that plaintiff was a type I diabetic on a two-month

---

[11]Plaintiff returned to Dr. Perlin again on September 27, 2012, but the record included no examination notes and listed peripheral neuropathy in the Assessment and Plan. (Tr. 103). The Current Plan was to restart plaintiff on hydrocodone-acetaminophen 5-325 MG, 1 tablet every eight hours as needed. (Id.).

[12]On November 1, 2012 plaintiff returned to Dr. Perlin for peripheral neuropathy, but there are no examination notes. (Tr. 99). The Current Plans were to restart plaintiff on hydrocodone-acetaminophen 5-325 MG, 1 tablet every eight hours as needed. (Id.).

schedule for preventive diabetic foot care due to history of infection and left hallux amputation. (Tr. 1569-70).

On March 1 (Tr. 85-87, 1488-89) and March 28, 2013 (Tr. 81-84, 1491-92), plaintiff presented to Dr. Perlin for follow up of type I diabetes with hypertension;[13] on April 25, plaintiff returned but no complaint was listed (Tr. 77-79); on June 11, plaintiff presented with complaints of hypertension (Tr. 74-76); on July 18, plaintiff returned for follow-up for diabetes mellitus, type I (Tr. 71-73);[14] on August 16, plaintiff presented with no complaints listed, but the Assessment and Plan included gastroesophageal reflux disease and a history of helicobacter pylori (Tr. 68-69); on October 18, plaintiff returned for follow-up for diabetes mellitus, type I and a flu vaccination (Tr. 65-67); on November 19, she presented for a follow-up physical exam, for which the assessment and plan noted herpes labialis (Tr. 62-64); on December 4 (Tr. 60-61) and December 20, 2013 (Tr. 57-59) plaintiff returned for helicobacter pylori and gastroesophageal reflux disease; and on January 21, 2014, she presented for follow-up diabetes mellitus, type I with a note of an intramural leiomyoma in the assessment and plan. (Tr. 54-56).

Based on a referral by Dr. Perlin, a radiologist examined plaintiff's shoulder on February 17, 2014, and opined that plaintiff's imaging was most consistent with suspected os acromiale. (Tr. 171-72). Images of plaintiff's cervical spine were negative with no evidence of fracture or abnormality. (Tr. 173). On February 26, 2014, Dr. Steven

---

[13]On April 23, 2013, plaintiff presented to Dr. Perlin but there are no examination notes and only peripheral neuropathy listed under Assessment & Plans. (Tr. 80). The Current Plans were to restart plaintiff on hydrocodone-acetaminophen 5-325 MG, 1 tablet every eight hours as needed and to continue Ascensia Autodisc Test, 1 disk three times daily. (Id.).

[14]On July 24, 2013, plaintiff returned to Dr. Perlin but there were no examination notes, only an Assessment and Plan for diabetes mellitus, type I, and a Current Plan to start plaintiff on Sure Comfort Insulin Syringe and for patient education on type I diabetes. (Tr. 70).

Bernstein wrote to Dr. Perlin about the MRI of plaintiff's shoulder; his impressions were of a "severe focal partial tear of the conjoined portion of the supraspinatous and infraspinatus tendons at the level of the critical zone[,]" but a "small vertical full-thickness tear could not be definitively excluded[,]" and there was "an accessory acromiale with fluid in the synchondrosis." (Tr. 169-70).

On June 22, 2014, plaintiff returned to Norwalk Hospital (Tr. 145-46, 153-66) with moderate, constant abdominal pain that was rated from a six to a nine out of ten, with nausea, vomiting, and a loss of appetite. (Tr. 157-58). By that afternoon, plaintiff's pain status was decreased and she was improving. (Tr. 159). Plaintiff had a pelvic transabdominal and transvaginal ultrasound, which noted a mass cranial to the urinary bladder most likely representing a right ovarian mass. (Tr. 145-46, 153-56, 160-64). Plaintiff was advised to follow up with OB/GYN due to concerns of malignancy. (Tr. 146, 156, 160). A CT abdomen and pelvis without contrast was also performed that day, for which the impression was as follows: "[n]ew large complex pelvic mass is possibly related to a large necrotic uterine fibroid; however, is highly suspicious for neoplasm of ovarian origin. Further evaluation with ultrasound and/or MRI is recommended." (Tr. 165-66). Dr. Arthur Strichman provided differential diagnoses of abdominal pain, appendicitis, bowel obstruction, ureteral stone, incarcerated hernia, or pelvic mass. (Tr. 159). Dr. Strichman noted that he spoke with the midwife from the oncology group who would follow-up with plaintiff. (Tr. 160).

Plaintiff returned to Dr. Perlin on June 24, 2014 for a pre-operative visit for a total abdominal hysterectomy scheduled two days later with Dr. Eva Olah, an OB/GYN. (Tr. 50-52). This examination was normal and plaintiff was at an acceptable operative risk for the planned surgery. (Id.).

On June 27, 2014, plaintiff had a chest x-ray which found "[p]atchy consolidation at both lung bases" which Dr. David Klein opined could be related to crowding due to decreased lung volume or focal minimal pneumonia. (Tr. 150-51).

Plaintiff presented to Dr. Perlin again on July 17, 2014, for a post-operative visit, with the Assessment and Plan listing uterine leiomyoma and diabetes mellitus, type I. (Tr. 47-49).

At Dr. Perlin's request, plaintiff underwent a stress test at St. Vincent's Regional Heart and Vascular Center on August 13, 2014 due to complaints of chest pain. (Tr. 143-44). Myocardial perfusion images revealed a "moderate intensity, medium size, mostly reversible defect involving the inferior wall" and a left ventricular wall motion study found normal wall motion and wall thickening. (Id.). Dr. Maria Palvio concluded that plaintiff had inferior wall ischemia and normal left ventricle function. (Id.). On October 9, 2014, plaintiff returned to Dr. Perlin for a follow-up physical exam and flu vaccine, with a diagnosis of diabetes mellitus and hypertension. (Tr. 43-46).

C. MEDICAL OPINIONS/EXAMINATIONS

On April 20, 2012, state agency medical consultant Dr. Roland Einhorn reviewed the evidence of record (Tr. 256-64) and found that plaintiff had severe impairments of diabetes mellitus, peripheral neuropathy, obesity, and peripheral vascular (arterial) disease, and a non-severe impairment of essential hypertension. (Tr. 259). Dr. Einhorn considered Listing 11.14 for peripheral neuropathy, but found that plaintiff did not meet that listing. (Tr. 259-60). Dr. Einhorn found that plaintiff had exertional limitations limiting her to occasionally lifting and/or carrying twenty pounds; frequently lifting and/or carrying ten pounds; standing and/or walking for a total of two hours; sitting for a total of about six hours in an eight-hour workday; climbing ramps/stairs occasionally; never climbing

ladders/ropes/scaffolds; and balancing, stooping, kneeling, crouching, and crawling occasionally. (Tr. 260-61). Dr. Einhorn found that plaintiff had no manipulative, visual, or communicative limitations, but that she had environmental limitations such that she should avoid concentrated exposure to extreme heat or cold and all exposure to hazards. (Tr. 261-62).

On October 11, 2012, State Agency medical consultant Dr. Firooz Golkar reviewed the evidence of record (Tr. 269-78) and made the same findings as Dr. Einhorn, except that he found that plaintiff had no severe impairment of peripheral vascular (arterial) disease, but a severe impairment of amputation of her left big toe (Tr. 273); Dr. Golkar also evaluated plaintiff for Listing 1.05 for amputation, but found that plaintiff's conditions did not meet this listing. (Id.). Based on his evaluation, Dr. Golkar opined that plaintiff demonstrated the maximum sustained work capability to perform sedentary work. (Tr. 276).

Dr. Perlin provided a functional assessment of plaintiff dated February 9, 2013 (Tr. 1437, 1440-47) in which he opined that plaintiff cannot work because of "severe weakness due to neuropathy." (Tr. 1440).  Dr. Perlin opined that in an eight hour work day, plaintiff could sit for one hour with normal breaks; never stand or walk; occasionally lift or carry up to five pounds but never lift or carry six or more pounds; use both hands for push and pull arm controls and simple grasping; never use either hand for fine manipulation; never bend, squat, crawl, climb, or reach; and never be exposed to unprotected heights, moving machinery, marked changes in temperature or humidity, driving, dust or fumes. (Tr. 1441-43). Dr. Perlin opined that plaintiff was compliant with her medications (Tr. 1447), which at that time included Victoza, 18mg; Avapro 150mg; HumaLOG 100 unit; NovoLIN 100 Unit; Simvastatin 20mg; Hydrochlorothiazide 25mg;

Embrace blood glucose test; Colace 100mg; Bayer contour test; and Diflucan 150mg. (Tr. 1450).

On July 7, 2013, Dr. Perlin completed a Medical Source Statement of Ability to Do Work-Related Activities. (Tr. 1576-81). According to Dr. Perlin, due to severe neuropathy, plaintiff could occasionally lift or carry up to ten pounds, but never lift or carry eleven or more pounds (Tr. 1576); sit for fifteen minutes without interruption and stand or walk for five minutes without interruption (Tr. 1577); sit, stand, and walk each for thirty minutes total in an eight hour work day (id.); occasionally climb stairs and ramps but never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl (Tr. 1578); and never tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat or vibrations. (Tr. 1579). Plaintiff can ambulate without a cane. (Tr. 1577). Based on plaintiff's physical impairments, Dr. Perlin opined that she can shop; travel without a companion for assistance; ambulate without a wheelchair, walker, or two canes or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for personal hygiene; and sort, handle, and use paper/files. (Tr. 1580).

## III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.   First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable

mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the Court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

However, the Court's responsibility is always to ensure that a claim has been "fairly evaluated." Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983)(citation omitted). See also Schupp v. Barnhart, No. 3:02 CV 103 (HBF)(WWE), 2004 WL 1660579, at *1 (D. Conn. Mar. 12, 2004), Magistrate Judge's Recommended Ruling approved and adopted, No. 3:02 CV 103 (WWE)(D. Conn. May 7, 2004). As discussed in Schupp, the Court must keep in mind that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)(citations omitted). Similarly, the ALJ must set forth the crucial factors in any determination with sufficient specificity to enable a reviewing court

to decide whether the determination is supported by substantial evidence. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

IV. DISCUSSION

Following the five step evaluation process,[15] ALJ Kuperstein found that plaintiff remained insured under the Social Security Act through June 30, 2013 (Tr. 206; see also Tr. 362-80), and had not engaged in substantial gainful activity since August 31, 2008. (Tr. 207, citing 20 C.F.R. §§ 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.). The ALJ concluded that plaintiff has the severe impairments of diabetes mellitus with diabetic neuropathy, history of drug resistant infection of the left foot status post amputation of left great toe, obesity, and plantar fasciitis (Tr. 207-08, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), and the non-severe impairments of alleged diabetes-related hand problems, right plantar fasciitis and facet lumbago, headaches, and rheumatoid arthritis. (Id.). The ALJ found that from August 31, 2008 through June 7, 2012, plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R.

---

[15]An ALJ determines disability using a five-step analysis. See 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is currently employed, the claim is denied. Id. If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

Part 404, Subpart P, Appendix I. (Tr. 208-09, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

At step four, the ALJ found that, from May 26, 2010 through June 7, 2012, plaintiff had the residual functional capacity ["RFC"] to perform a highly compromised level of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), and she needed to be absent from work at least two days per month on a regular basis. (Tr. 209-10). Prior to May 26, 2010, however, and beginning again on June 8, 2012, the ALJ found that the plaintiff's combined physical impairments limited her from performing more than a full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). (Tr. 210-11).

The ALJ found that there was insufficient evidence of plaintiff's past relevant work to make a finding at the fourth step of the sequential determination, and under the "expedited process" of 20 C.F.R. §§ 404.1520 and 416.920, he proceeded to step five of the sequential evaluation. (Tr. 211-12). Plaintiff is defined as a younger individual (Tr. 212, citing 20 C.F.R. §§ 404.1563 and 416.963) with more than a high school education. (Id., citing 20 C.F.R. §§ 404.1564 and 416.964). The ALJ found that from May 26, 2010 through June 7, 2012, plaintiff's acquired job skills as a home health aide, certified nurse's aide, and customer service representative would not transfer to other occupations because of her compromised RFC; the ALJ found that before and after that time period, however, the transferability of plaintiff's skills was moot due to her young age. (Id., citing 20 C.F.R. §§ 404.1568 and 416.968). The ALJ concluded that from May 26, 2010 through June 7, 2012, there were no jobs that existed in significant numbers in the national economy that plaintiff could have performed based on her RFC, age, education, and work

experience (Tr. 212-13, <u>citing</u> 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c) and 416.966), and therefore plaintiff was under a disability during that closed period. (Tr. 213, <u>citing</u> 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The ALJ found that beginning June 8, 2012, plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (Tr. 213, <u>citing</u> 20 C.F.R. §§ 404.1594(f)(2) and 416.994(b)(5)(i)), and as of that date, plaintiff experienced medical improvement of her overall physical condition such that her RFC permitted sedentary job duties. (Tr. 213-14, <u>citing</u> 20 C.F.R. §§ 404.1594(b)(1), 404.1594(b)(4)(i), 416.994(b)(1)(i), and 416.994(b)(1)(iv)(A)). Accordingly, the ALJ found that plaintiff had the RFC to perform a full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) from the alleged onset date of August 31, 2008 through May 25, 2010, and from June 8, 2012, through the present. (Tr. 214). Based on plaintiff's age, education, work experience, and RFC during these two time periods, ALJ Kuperstein used the Medical-Vocational Rules to find that plaintiff was not disabled prior to May 26, 2010 and after June 8, 2012.[16] (Tr. 215). Accordingly the ALJ found that plaintiff's disability ended June 8, 2012, based upon medical improvement related to her ability to work. (Tr. 215, <u>citing</u> 20 C.F.R. §§ 404.1594(f)(8) and 416.994(b)(5)(vii)).

Plaintiff seeks an order reversing or remanding the decision of the Commissioner on the grounds that the ALJ committed five "serious factual errors" (Dkt. #17, Brief at 9-13); the ALJ erred in his evaluation of plaintiff's condition under the listing of impairments

---

[16]The ALJ appears to make a typographical error relating to the end date of the closed period of disability: although the rest of the decision refers to the closed period of disability ending on June 7, 2012, on Tr. 215 he refers to the period after the closed period of disability as "beginning June 18, 2012" rather than June 8, 2012.

(id. at 13-15); the ALJ failed to properly follow the treating physician rule (id. at 15-18); the ALJ erred in his evaluation of medical improvement (id. at 18-20); the ALJ did not properly determine plaintiff's credibility (id. at 20-22); the ALJ failed to secure testimony from a vocational expert (id. at 22-23); and defendant failed to meet her burden of proof (id. at 23).  Defendant counters that the ALJ accurately stated the evidence of record (Dkt. #22, Brief at 15-18); plaintiff did not satisfy the listing requirements for Listing 8.04 or Listing 11.14 (id. at 18-25); the ALJ properly considered medical opinion (id. at 26-31); the ALJ properly assessed plaintiff's credibility (id. at 31-33); the ALJ correctly applied medical improvement standards (id. at 34-35); and the ALJ correctly determined that plaintiff could perform work in the national economy (id. at 35-36).

A. FACTUAL ERRORS

### 1. THE ALJ WAS NOT FACTUALLY MISTAKEN IN FINDING A DISCREPANCY BETWEEN DR. PERLIN'S MEDICAL OPINION AND HIS TREATMENT NOTES

Plaintiff argues that the ALJ incorrectly identified a discrepancy between Dr. Perlin's treatment notes, which showed good physical examinations since June 8, 2012, and his medical source statement; accordingly, plaintiff argues the ALJ improperly gave Dr. Perlin's opinion "no weight." (Dkt. #17, Brief at 9, citing Tr. 211).  Although the weight assigned to Dr. Perlin's opinion will be discussed in Section IV.C.2 infra, the ALJ did not err by identifying a discrepancy between Dr. Perlin's treatment notes and his medical source statement.

Plaintiff argues that Dr. Perlin's medical records from late 2012 through the date of the hearing reflect significant medical problems including two hospital visits; her references to the record, however, fail to support this argument. (Dkt. #17, Brief at 9-10, citing Tr. 1458, 1471). Plaintiff first refers to notes from Dr. Perlin's office, dated April 9,

2012, reflecting plaintiff's admission to Norwalk Hospital from March 13 to March 21, 2012. (Tr. 1458). Because this hospitalization was in March 2012, it was during the closed period of disability found by the ALJ, and does not reflect significant medical problems in late 2012. (Tr. 665-88, 746-47, 1222-28). Plaintiff also cites to Dr. Perlin's notes, dated September 7, 2012, reflecting an emergency room visit on August 24, 2012. (Tr. 1471). Plaintiff does not actually cite to the medical records from that emergency room visit, but upon review, those records reflect that plaintiff presented for right flank pain and was discharged that day; notably, right flank pain is not associated in the record with any of plaintiff's alleged disabilities. (Tr. 1206-15).

Plaintiff further argues that during this time period, Dr. Perlin diagnosed plaintiff with continuing diabetes mellitus and peripheral neuropathy, plantar fasciitis, and facet lumbago. (Dkt. #17, Brief at 10). While plaintiff's conditions may have been ongoing, Dr. Perlin's notes from this time period include no particular examination findings related to plaintiff's diabetes mellitus or peripheral neuropathy. (See Tr. 43-115). Although plaintiff claims that the latter two diagnoses were made by Dr. Perlin during that time, plaintiff's claims are belied by her own citations to the record, which are treatment notes from Norwalk Hospital in 2013, and not from Dr. Perlin. (Tr. 1559, 1567).

Contrary to plaintiff's claims, Dr. Perlin's examination findings throughout this period are completely normal, showing that plaintiff was cooperative, well groomed, not sickly, and in no acute distress, with normal posture, normal gait, no edema, no varicose veins, normal cranial nerves, normal muscle tone in her upper and lower extremities bilaterally, normal strength in her upper and lower extremities bilaterally, normal sensation throughout, and symmetric 2/2 reflexes. (Tr. 71-72, 74-75, 77-78, 703-04, 1311-12, 1314-15, 1318-19, 1322-23, 1479-80, 1482-83, 1485-86, 1488-89, 1491-92).

These findings are inconsistent with the level of limitation opined by Dr. Perlin in his Medical Source Statement. (Tr. 1576-81). Accordingly, the ALJ did not err in identifying a discrepancy between Dr. Perlin's Medical Source Statement and his examinations of plaintiff after June 2012.

> 2. THE ALJ WAS FACTUALLY MISTAKEN IN GIVING DR. DEMATTEO-SANTA'S OPINION NO WEIGHT BECAUSE SHE "IS NOT A MEDICAL DOCTOR"

The ALJ gave "no weight . . . to the opinion dated July 18, 2012 of Marisa DeMatteo-Santa, [Doctor of Podiatric Medicine ['D.P.M.'],] that [plaintiff] should not perform any activity involving standing, walking, lifting, carrying, or bending to the extent that [plaintiff] was unable to perform any sedentary exertional work[,]" because "[t]his individual is not a medical doctor." (Tr. 211). Plaintiff argues that the ALJ erred in assigning no weight to Dr. DeMatteo-Santa's opinion because a podiatric surgeon is "indisputably and obviously a medical doctor."  (Dkt. #17, Brief at 10, citing Tr. 211). Defendant argues that the record shows Dr. DeMatteo-Santa is a D.P.M. and not a medical doctor, or M.D. (Dkt. #22, Brief at 15-16, citing Tr. 670-71, 689-95, 745, 1434).

Both parties agree that Dr. DeMatteo-Santa is a podiatrist, but bafflingly, neither party, nor the ALJ, refer to the regulations that explicitly address whether podiatrists should be considered acceptable medical sources. 20 C.F.R. §§ 404.1513(a)(4) and 416.913(a)(4)[17] provide that acceptable medical sources include "[l]icensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on

---

[17]Effective March 27, 2017, acceptable medical sources are defined in 20 C.F.R. §§ 404.1502(a) and 416.902(a).  An acceptable medical source includes a "[l]icensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle[.]" 20 C.F.R. §§ 404.1502(a)(4), 416.902(a)(4).

whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle[.]"

In Connecticut, podiatrists may treat conditions of the foot. See CONN. GEN. STAT. § 20-50 (defining podiatric medicine as "the diagnosis and treatment, including medical and surgical treatment, of ailments of the foot and the anatomical structures of the foot and the administration and prescription of drugs incidental thereto. It shall include treatment of local manifestations of systemic diseases as they appear on the foot."). Accordingly, Dr. DeMatteo-Santa is appropriately treated as an acceptable medical source for the purpose of establishing impairments of plaintiff's foot, including the manifestation of diabetes mellitus as it appears on her foot. For this reason, the ALJ erred in finding that Dr. DeMatteo-Santa's opinion should categorically be given "no weight" because she "is not a medical doctor." (Tr. 211). The ALJ's flawed treatment of Dr. DeMatteo-Santa's records and opinions will be discussed further in Sections IV.A.4 and IV.C.1 infra.

### 3. THE ALJ WAS NOT FACTUALLY MISTAKEN IN STATING THAT PLAINTIFF HAD NO ONGOING IMPAIRMENT WHEN COMPLIANT WITH TREATMENT

Plaintiff argues that the ALJ was mistaken in stating that, from her alleged onset of disability to May 26, 2010, when plaintiff was "compliant with treatment, she was not experiencing any ongoing impairment or combination of impairments that resulted in" her being restricted beyond the full range of sedentary work. (Dkt. #17, Brief at 10, referring to Tr. 211). Plaintiff argues she had "numerous debridement procedures for multiple and deadly [n]ecrotizing [f]asciitis infections[,]" and was non-weight-bearing for much of this time. (Dkt. #17, Brief at 10)(multiple internal citations omitted).

Notably, the ALJ stated plaintiff had no ongoing impairment when she was compliant with her treatment. (Tr. 211). The medical records to which plaintiff cites reflect

33

treatment for abscesses when plaintiff was <u>not compliant</u> with treatment. In these records, plaintiff's doctors specifically noted that plaintiff presented with "poorly-controlled diabetes" (Tr. 443), and that plaintiff's cellulitis was "[m]ost likely . . . due to poorly controlled diabetes." (Tr. 452. <u>See</u> Tr. 211, 439-41, 455).

Even if the Court were to ignore that the ALJ's finding was limited to times when plaintiff was compliant with treatment, as defendant points out (Dkt. #22, Brief at 16-17), plaintiff's citations still do not support her argument. One of the records cited by plaintiff is from the date the ALJ found plaintiff to become disabled — May 26, 2010 — and thus does not reflect her impairment before this time (Tr. 435); other cited records are from May 2007 (Tr. 467, 470, 471, 475), which predates plaintiff's alleged onset of her disability. The remainder of the records plaintiff cites, as well as the record as a whole, show that from August 2008 to May 2010 plaintiff had no necrotizing fasciitis infections, debridement procedures, or documented periods of non-weight-bearing. (<u>See</u> Tr. 439-60). During this period, plaintiff had one abscess in September 2008 (Tr. 443) and one in July 2009 (Tr. 439); both times, plaintiff reported that the abscess started no more than one and a half weeks earlier (<u>id.</u>), testing revealed no fasciitis or MRSA (Tr. 440, 444, 449-53), plaintiff was started on antibiotics and responded well (Tr. 440, 444), plaintiff was diagnosed with only cellulitis (Tr. 441, 444), and was released from the hospital within three or five days in stable condition. (Tr. 439-41, 443-44).

<u>4. THE ALJ WAS NOT FACTUALLY MISTAKEN THAT PLAINTIFF'S PODIATRY RECORDS REFLECT THAT ULCERATION ON PLAINTIFF'S TOE WAS RESOLVED</u>

Plaintiff argues that it was "a misstatement of undisputed facts[]" (Dkt. #17, Brief at 10) for the ALJ to claim that "[o]n June 8, 2012, [plaintiff's] podiatrist specifically noted that the ulceration on the left great toe was resolved and did not note that there was any

further ongoing problem related to the infection." (Id., citing Tr. 213). Plaintiff's claim is patently false: on June 8, 2012, Dr. DeMatteo-Santa explicitly said, "[t]he ulceration of the left great toe is resolved[,]" adding that plaintiff had no complaints and should follow-up in one month. (Tr. 695). Further, plaintiff contradicts her own thesis; plaintiff argues that the resolution of the toe infection was not just true, but "obvious[,]" by adding: "Because amputated body parts do not regenerate, it is obvious that there was no further left great toe infection." (Dkt. #17, Brief at 10-11)(emphasis added). Accordingly, the ALJ did not misstate Dr. DeMatteo-Santa's June 8, 2012 conclusion that plaintiff's ulceration had resolved.

### 5. THE ALJ DID NOT ERR IN FINDING THAT PLAINTIFF'S FACET LUMBAGO AND PLANTAR FASCIITIS WERE NOT ONGOING PROBLEMS

The ALJ found that plaintiff's facet lumbago and plantar fasciitis, which were first noted in plaintiff's medical records on January 23, 2013, were nonsevere impairments because plaintiff's medical records "fail to reflect [that facet lumbago and plantar fasciitis] are ongoing problem[s.]" (Tr. 207. See also Tr. 1559, 1567). Plaintiff argues that the ALJ erred because the absence of these diagnoses from the record is explained by the short window of time between the initial diagnosis and the hearing, not by the lack of duration of these impairments. (Dkt. #17, Brief at 11). As defendant notes (Dkt. #22, Brief at 17-18), there are numerous treatment notes dated between January 23, 2013 and the hearing, and not one reflects these diagnoses. Plaintiff had three examinations by Dr. Perlin (see Tr. 81-90) and one by Dr. Abramsen at Norwalk Hospital (see Tr. 1569). Those treatment notes reflect no complaints, treatments, or diagnoses associated with facet lumbago or plantar fasciitis. (Tr. 81-90, 1569). Even in records subsequent to the hearing before the ALJ, there is no other documentation of either condition. (See Tr. 71-80).

Accordingly the ALJ reasonably concluded that plaintiff's medical records do not reflect that her January 2013 diagnoses of facet lumbago and right plantar fasciitis were ongoing problems. (See Tr. 207).

Although plaintiff fails to substantiate many of the ALJ's supposed factual errors,[18] plaintiff does raise serious issues that will be addressed below regarding the ALJ's improper handling and assessment of nearly all of the medical evidence, as well as the plaintiff's credibility.

B. LISTINGS

When a claimant has an impairment that meets or equals a listing on the Listing of Impairments ["Listings"], she will be found to be disabled regardless of her age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). The purpose of the Listings is to describe impairments that the Commissioner considers sufficiently severe to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a). Plaintiff has the burden of proving that she meets or equals a listing. See Villella v. Astrue, 588 F. Supp. 2d 253, 259 (D. Conn. 2008)("The burden of establishing a disability is on the claimant. Once the claimant meets the burden for the first four steps of the disability evaluation, however, the burden then shifts to the Commissioner for the fifth step.")(citation omitted). For a claimant to show that she has an impairment that meets a Listing, the impairment must

_____

[18]As cautioned by U.S. District Judge Jeffrey A. Meyer in his recent ruling in Powell v. Colvin, 14 CV 1176 (JAM), Dkt. #30, plaintiff's counsel must be more careful in her citations to the administrative record. As expressed in the Recommended Ruling in Powell, Dkt. #19, at 34-35, n.33, with the docket of Social Security appeals being as oppressive as it is in this district, the District Judges and Magistrate Judges can ill afford these "wild goose chases," cite-checking transcript references that are completely irrelevant to the arguments made by counsel. Besides being unfair to the court personnel and judicial officers who labor on these files, it is equally unfair to the other Social Security claimants and their attorneys who wait patiently for court decisions on their appeals.

meet all of the criteria of that Listing. Sullivan v. Zebley, 493 U.S. 521, 530 (1990), superceded by statute on other grounds as stated in Colon v. Apfel, 133 F. Supp. 2d 330, 338 (S.D.N.Y. 2001); see 20 C.F.R. § 416.926(a)-(b). The claimant bears the burden of presenting evidence in support of her claim if per se disability is based upon a Listing. See 42 U.S.C. § 423(d)(5)(A), 20 C.F.R. §§ 404.1512(a), 416.912(a); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

Plaintiff argues that the ALJ erred in finding that she did not meet or equal two Listings under 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926: Listing 8.04 and Listing 11.14. (Dkt. #17, Brief at 13-15).[19]

### 1. LISTING 8.04

Listing 8.04 requires a claimant to demonstrate "[c]hronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. Part 404, Subpart P, App. 1, 8.04.  Extensive skin lesions are defined as "those that involve multiple body sites or critical body areas, and result in a very serious limitation." Id. § 8.00(C)(1). The regulations provide three examples of extensive skin lesions: (a) skin lesions that interfere with the motion of a claimant's joints and that very seriously limit her use of more than one extremity; (b) skin lesions on the palms of both hands that very seriously limit a claimant's ability to do fine and gross motor movements; and (c) skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously

---

[19]Although at one point plaintiff's brief provides, "Inclusion in the Listing of Impairments qualifies her Delusional Disorder as a disability thus entitling her to DIB and SSI[,]" (Dkt. #17, Brief at 15)(emphasis added), plaintiff makes no other argument for meeting a Listing for delusional disorder, nor is that even alleged as a basis for disability. The Court will assume this is an error by plaintiff's counsel.  See note 18 supra.

limit a claimant's ability to ambulate. Id. §§ 8.00(C)(1)(a)-(c). Observing that all provided examples of "extensive skin lesions" include serious limitation to more than one extremity, ALJ Kuperstein found that the severity of plaintiff's left foot impairment approached, but did not meet or equal, Listing 8.04, because plaintiff had a very serious infection of only one extremity. (Tr. 208).

Plaintiff argues that she meets or equals Listing 8.04 based upon her history of necrotizing fasciitis in several locations on her body involving infection in 2007, 2008, 2009, and 2010-12, and that the ALJ erred in finding that the definition of "extensive skin lesions" requires serious infection of more than one extremity. (Dkt. #17, Brief at 13-14).

Listing 8.04 has a durational requirement such that there must be "chronic infection of the skin or mucous membranes with extensive . . . ulcerating skin lesions that persist for at least [three] months despite continuing treatment as prescribed." 20 C.F.R. Part 404, Subpart P, App. 1, § 8.04 (emphasis added). Although plaintiff has a history of skin lesions, plaintiff only had one skin lesion that persisted for at least three months despite continuing treatment as prescribed: this was for the treatment of plaintiff's left toe, which underwent multiple debridements, resulted in a twenty month stay at a nursing facility, and ultimately resulted in amputation of her great left toe.

Plaintiff fails to demonstrate that any other skin infections, and the treatment thereof, lasted for three months or more. Plaintiff's first skin infection was an abscess due to necrotizing fasciitis on her left thigh on May 6, 2007; plaintiff responded to antibiotics, was treated for necrotizing fasciitis, debrided, and discharged in good condition on June 9, 2007. (Tr. 461, 463, 479, 483, 1408-10). This occurrence neither falls within plaintiff's alleged period of disability, nor meets the three month duration requirement. Sixteen months later, plaintiff presented to Norwalk Hospital on September 23, 2008 with an

abscess on her left buttock that appeared one and a half weeks earlier; after five days of hospitalization, plaintiff responded well to intravenous antibiotics and was discharged in stable condition with seven days of antibiotics to take after discharge. (Tr. 443-60). This suggests an infection and treatment lasting approximately three weeks, not three months. Nine months later, on July 5, 2009, plaintiff was admitted to Norwalk Hospital due to left leg edema and lower left cellulitis which she reported began five days earlier. (Tr. 439). Plaintiff was started on intravenous antibiotics to which she responded well and was discharged in stable condition on July 7, 2009, with twelve days of antibiotics to take after discharge. (Tr. 439-42). Accordingly, the record suggests this infection and treatment lasted no longer than seventeen days. Because plaintiff does not present for infection again until May 26, 2010 — when she presents with the toe infection that initiates the period of disability — the record does not demonstrate that plaintiff had any skin lesions lasting three months or more before that date, and thus cannot meet or equal Listing 8.04 during this time.

In evaluating plaintiff's toe infection and left foot impairment from May 26, 2010 through June 7, 2012, the ALJ concluded that the "severity of [plaintiff's] left foot impairment approaches, but does not meet or equal, Listing-level severity under Section 8.04" because the infection affected one, not two, extremities.   (Tr. 208).   Although plaintiff correctly argues that the listed examples of extensive skin lesions are not exhaustive (Dkt. #17, Brief at 14), the examples all involve multiple extremities affected by skin lesions. Because the definition of "extensive skin lesions" requires them to affect "multiple body sites or critical body areas," 20 C.F.R. Part 404, Subpart P, App. 1, § 8.00(C)(1), and every example includes multiple extremities, it was reasonable for the ALJ

to interpret the "multiple body sites" requirement of the "extensive skin lesion" definition to exclude cases of infection in multiple places on just one extremity.

As defendant counters, even assuming arguendo, that the ALJ erred in finding plaintiff did not meet Listing 8.04 from May 26, 2010 through June 7, 2012, such an error would be harmless because the ALJ found plaintiff disabled during this period anyway. (Dkt. #22, Brief at 20-21). Reversal and remand are required only where there is significant chance that, but for the error, the agency might have reached a different result. Edwards v. Astrue, No. 3:10 CV 1017 (MRK), 2011 WL 3490024, at *9 (D. Conn. Aug. 10, 2011), citing NLRB v. American Geri-Care, Inc., 697 F.2d 56, 64 (2d Cir. 1982)(citations omitted), cert. denied, 461 U.S. 906 (1983).

After June 7, 2012, when the ALJ found that plaintiff's period of disability ended, the record does not reflect, nor does plaintiff cite, any evidence of another skin lesion or ongoing skin infection. Accordingly, the ALJ did not err in finding that plaintiff does not meet or equal Listing 8.04 after June 7, 2012.

### 2. LISTING 11.14

Listing 11.14 requires peripheral neuropathy characterized by "disorganization of motor function . . . in spite of prescribed treatment[]" "in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station[.]" 20 C.F.R. Part 404, Subpart P, App. 1, § 11.14, incorporating by reference § 11.04(B).[20]

---

[20]"Persistent disorganization of motor function" is defined as "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction)[.]" Id. § 11.00.C. In addition, "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." Id.

Plaintiff argues that the ALJ "completely deferr[ed] to Dr. Golkar's [the State Agency medical consultant] opinion on the reconsideration medical review[]" in evaluating plaintiff for the Listings. (Dkt. #17, Brief at 14).  Defendant responds that "[a]t step three, the ALJ specifically considered Listing 8.04 and Listing 11.14 and properly found that plaintiff's impairments did not meet or equal either Listing." (Dkt. #22, Brief at 18).

Although defendant argues that the ALJ considered Listing 11.14, the ALJ only assigned "extra weight" to Dr. Golkar's opinion that "the Listings were not met as of October 2012" because "State Agency medical consultants have the responsibility to apply these Listings to numerous cases which involve serious diabetes and neuropathy." (Tr. 208). Notably, the ALJ entirely fails to mention the criteria for Listing 11.14. The absence of enumerating the crucial factors in evaluating Listing 11.14 makes it impossible to determine whether the ALJ's finding is supported by substantial evidence. See Ferraris, 728 F.2d at 587 ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.")(citation omitted).

Even in deferring to Dr. Golkar, the ALJ did not rely upon a discussion of Listing 11.14 sufficient for review. Although the ALJ claims that "Dr. Golkar's reconsideration medical opinion is supported by chronological, detailed references to reports from the treating sources cited in finding two above[]" (Tr. 209), Dr. Golkar's "assessment" of the Listings similarly fails to discuss their criteria, and reflects nothing more than the assertion that the Listings were considered. (Tr. 273).[21]

---

[21]This is not the only time the ALJ defers to an opinion of Dr. Golkar that is not as well-supported as the ALJ suggests: as the basis for his finding that plaintiff's hypertension is not a severe impairment, the ALJ wrote that "Dr. Golkar gave specific reasons, which supported his opinion that her hypertension is not a severe impairment[,] that are consistent with the evidence in

The most significant evaluation of plaintiff's medical records as they relate to the criteria of Listing 11.14 is set forth in defendant's brief. (Dkt. #22, Brief at 23-25 (discussing findings that plaintiff had normal musculoskeletal exams, gait and posture; that plaintiff did not use a cane or walker; and that plaintiff was not diagnosed with neuropathy of her hands)). A reviewing court, however, "may not accept appellate counsel's post hoc rationalizations for agency action[.]" Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999), citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). While it is far from clear that plaintiff has met her burden of demonstrating that she meets or equals Listing 11.14, the appropriate course is to remand this case to the SSA to allow the ALJ to consider the requirements set forth in Listing 11.14 and then explain why plaintiff does or does not meet or equal the criteria of Listing 11.14.

### C. TREATING PHYSICIAN RULE/MEDICAL EVIDENCE

The treating physician rule generally requires an ALJ to give "special evidentiary weight" to the medical opinion of a claimant's treating physician. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Such deference is granted to treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective . . . that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician on the nature and severity of a claimant's impairment will be assigned controlling weight if it "is well-supported by medically acceptable clinical

---

the record since the alleged onset date." (Tr. 208). The ALJ never mentioned what Dr. Golkar's "specific reasons" were, and Dr. Golkar's submission reflected only a list of impairments marked either severe or not severe, with no further explanation. (Tr. 273).

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record[.]" Id. The opinions of a treating physician are not afforded controlling weight where they are inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)(treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record[]")(citations omitted). When a claimant's treating physician is not given controlling weight, the ALJ is to consider the length, nature, and extent of the treatment relationship, as well as the supportability, consistency and specialization of the source's opinion, in determining the weight to give the treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 404.1527(c)(2)(i)-(ii), 404.1527(c)(3)-(6), 416.927(c)(2), 416.927(c)(2)(i)-(ii), 416.927(c)(3)-(6). When a treating physician is not given controlling weight, the ALJ "must specifically explain the weight that is actually given to the treating physician's opinion." Shrack v. Astrue, 608 F. Supp. 2d 297, 301 (D. Conn. 2009)(citation & footnote omitted). Courts have consistently held that the failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is ground for remand. Schaal, 134 F.3d at 505; see Social Security Ruling ["SSR"] 96-2p, Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, 1996 WL 374188 (S.S.A. July 2, 1996). See also Schupp, 2004 WL 1660579 at *8 ("[The decision] must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and reasons for that weight.").

Plaintiff claims that the ALJ violated the treating physician rule by assigning "no weight" to the opinions of both of plaintiff's treating physicians, Dr. Perlin and Dr. DeMatteo-Santa, when they should have been assigned controlling, or at least significant,

weight. (Dkt. #17, Brief at 15-18). The ALJ's evaluation of these two sources will be considered separately.

### 1. DR. DEMATTEO-SANTA

Plaintiff argues that the ALJ improperly gave "no weight" to the opinion of Dr. DeMatteo-Santa, who opined that plaintiff "should not perform any activity involving standing, walking, lifting, carrying, or bending. She is status-post amputation of the left great toe due to complications from [d]iabetes and is at high-risk for further complications/amputations." (Dkt. #17, Brief at 16, citing Tr. 211, 745). As discussed in Section IV.A.4 supra, Dr. DeMatteo-Santa is a podiatrist and as such, is an acceptable medical source on impairments of the foot. Accordingly, the opinion of plaintiff's podiatrist on plaintiff's foot impairment should be given controlling weight unless it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or inconsistent with the other substantial evidence in the plaintiff's case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Because the ALJ failed to treat Dr. DeMatteo-Santa as a treating physician, or even an acceptable medical source, with respect to plaintiff's foot impairments, the ALJ failed to comply with the treating physician rule.

The ALJ does remark upon the inconsistency between Dr. DeMatteo-Santa's treatment records and her opinion, observing that her treatment notes do not reflect that plaintiff has an ongoing limitation that would preclude her from doing sedentary work. (Tr. 211). Although consistency is one of the appropriate factors to be considered when a treating physician is not given controlling weight, 20 C.F.R. §§ 404.1527(c)(2), 404.1527(c)(2)(i)-(ii), 404.1527(c)(3)-(6), 416.927(c)(2), 416.927(c)(2)(i)-(ii), 416.927(c)(3)-(6), it is not clear that the ALJ made this observation in the course of properly applying the treating physician rule. Although the ALJ is permitted to find a

44

treating source's opinion unsupported by the rest of the record, and non-controlling, the failure to identify Dr. DeMatteo-Santa as such an opinion, or even an acceptable medical source, with respect to plaintiff's foot impairment reflects a failure to properly apply the treating physician rule.

It adds to the Court's concern that in other sections of his decision, the ALJ makes mistakes about the record, including citing to nonexistent podiatric notes. The ALJ found that "[t]he treatment notes [sic] wound infection problems increased in July, October and November 2010 — but not at that level earlier." (Tr. 211, citing Exhibit 21F, pp. 17-34). Upon examination, however, Exhibit 21F is only fifteen pages long, and the those pages are entirely irrelevant to the ALJ's claim: Exhibit 21F contains records from plaintiff's podiatric treatment in 2012 and 2013, and thus could not demonstrate that plaintiff's infection problems increased from July to November 2010. (Tr. 1558-72).

### 2. DR. PERLIN

As discussed extensively in Section II.B.3 supra, Dr. Perlin's examination notes are nearly identical throughout his treatment of plaintiff from September 1, 2011 through October 2014. (Tr. 40-140, 639-64, 698-735, 1309-65, 1437-93, 1573-91). The only notable difference, besides plaintiff's recorded vital information, is the identified reason for plaintiff's visit. (Id.). Remarkably, despite very frequent medical treatment by Dr. Perlin from 2011 through 2014, plaintiff's foot infection, diabetes mellitus, and peripheral neuropathy are not discussed in his treatment notes, except to record that she has these conditions. While plaintiff very well may have been disabled from May 26, 2010 through June 7, 2012 based upon the impairments resulting in her lengthy hospital admission, toe amputation, and treatment, Dr. Perlin's frequent examination notes provide practically no support for such a finding. Still, the ALJ relies on Dr. Perlin's treatment records in finding a

closed period of disability for plaintiff from May 26, 2010 through June 7, 2012. The ALJ writes that "Dr. Perlin's records and opinions of disability[] . . . support limitations below the SGA level of sedentary office work, for an extended period." (Tr. 209). The ALJ makes no specific reference to the record of Dr. Perlin's treatment notes supporting such limitations,[22] and a review of Dr. Perlin's treatment notes reflect consistently normal examinations from the start of treatment in 2011 through 2014.[23] (Tr. 41-140, 641-64, 700-35, 1310-65, 1450-93). Although plaintiff could have been disabled from May 26, 2010 through June 7, 2012, this Court is "unable to fathom[,]" based on the record, the foundation for the ALJ's conclusion that Dr. Perlin's records support the finding of below-sedentary limitations only during that closed period, and not before or after that closed period. See Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)("Cases may arise . . . in

---

[22]Two paragraphs later, the ALJ writes that "Dr. Perlin['s] treatment records and opinions include Exhibits 5F, 6F, 9F, 12F, 16F, 18F, 19F, 20F, and 22F." (Tr. 209). Despite listing the exhibits upon which the ALJ relied, it remains unclear to the reviewing Court upon which of the hundreds of page of exhibits the ALJ relied, if any, in determining that Dr. Perlin's records support his conclusion.

[23]A review of the exhibits cited in note 21 provides little substantive support for the ALJ's conclusion. Some of the cited exhibits are from Honey Hill and are unrelated to plaintiff's conditions (see Tr. 913-20)(discussing mental status examinations); others are illegible treatment notes by Dr. Perlin (Tr. 887-94), uninterpreted lab results (Tr. 1494-1554), and Dr. Perlin's medical opinions. (Tr. 1437-51,1573-81). A vast majority of these exhibits contain Dr. Perlin's treatment notes during the relevant time period, but fail to substantively discuss plaintiff's conditions and do not vary from his notes during the time period when the ALJ found that plaintiff had medically improved. (Tr. 639-64, 698-735, 1309-65, 1452-93).

The only other information in these exhibits related to plaintiff's limitations during this period is contained in a few activity status notations on the physician's order sheet at Honey Hill. These notes reflect that on June 18, 2010, plaintiff's activity status was "transfer with assist, non-weight bearing left lower extremity, ambulation status per physical therapy." (Tr. 931, 943. See also Tr. 923). On June 18, 2010, her activity status was "transfer with assist of sliding board, non-weight bearing left lower extremity, ambulation status per physical therapy." (Tr. 961). On August 18, 2010, plaintiff could "full weight bear" to the right extremity. (Tr. 949). On September 17, 2010, her activity status was "transfer with assist of 1, ambulate ad lib with rolling walker & TCC." (Tr. 967). On October 13, 2010, plaintiff could "ambulate independent [with] R.W. [with] walking boot." (Tr. 977). By November 12, 2010, plaintiff could bear weight on both legs (Tr. 983. See also Tr. 985, 991, 999, 1011, and 1015), and by March 18, 2011, she could ambulate independently with a walker. (Tr. 1025, 1029).

which we would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ. In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision.")(citations omitted). Accordingly, it is appropriate to remand the case for further findings or a clearer explanation for the decision.

It is also concerning that the ALJ articulated factual errors with respect to Dr. Perlin's treatment notes. The ALJ opined that "the regular treatment notes of Dr. Perlin since March 2012" support that plaintiff's "wound infection problems increased in July, October and November 2010—but not at that level earlier[.]" (Tr. 211). Because Dr. Perlin only began treating plaintiff in September 2011 (Tr. 137), his treatment notes could not address whether plaintiff's wound infection problems increased in July through November 2010, or at an earlier period. Elsewhere, in his finding of medical improvement, the ALJ found that Dr. Perlin's treatment notes "reflect improved physical examination signs since at least the medical improvement date."[24] (Tr. 210). However, since Dr. Perlin's treatment notes neither substantively discuss plaintiff's condition, nor vary over time, Dr. Perlin's records fail to include any "_improved_ physical examination signs[.]" (Id.)(emphasis added).

Additionally, it is problematic that the ALJ assigned Dr. Perlin's notes and opinions different weights at different periods of time without explanation, when Dr. Perlin's notes do not vary throughout his treatment of plaintiff. The ALJ cites Dr. Perlin's treatment records to support his finding that plaintiff was disabled from May 26, 2010 through June 7, 2012, and also to support his finding that plaintiff was not disabled after June 7, 2012,

_____

[24]No citation is provided to any particular treatment notes of Dr. Perlin.

when Dr. Perlin's treatment notes during these two time periods do not differ.[25] Dr. Perlin's consistent examination records throughout both time periods cannot support two opposite conclusions. It is highly problematic that the ALJ provides no reason why Dr. Perlin's treatment records and opinion should support a disability finding during one period, but not during another.

Further, the ALJ diminishes the weight of Dr. Perlin's opinion at some times, but not at others, without explanation. For the period after June 7, 2012, the ALJ found that Dr. Perlin's opinion of plaintiff's limitations was not supported because "Dr. Perlin's current opinion contains internal contradictions and does not show inability to use both hands, both feet, or perform sedentary jobs[,]" (Tr. 209) and "is inconsistent for the current period[.]" (Tr. 210). The regulations require an ALJ to consider the consistency of a treating physician's records in assigning it weight; thus, the ALJ was correct to consider whether Dr. Perlin's treatment notes support his medical opinion, and when concluding that they do not, to assign his opinion less weight when determining that plaintiff was not disabled after June 7, 2012. However, as Dr. Perlin's notes do not change over time, any inconsistency between his treatment notes and opinion after June 7, 2012, would also apply before to the period before June 7, 2012, and needs to be discussed.

Accordingly, the Court remands the case to the ALJ to consider and weigh the opinions of plaintiff's treating physicians. Upon remand, the ALJ should offer a detailed

---

[25]On the one hand, for the disability finding from May 26, 2010 through June 7, 2012, the ALJ opined that "Dr. Perlin's records and opinions of disability . . . support limitations below the SGA level of sedentary office work for an extended period[]" (Tr. 209); on the other hand, in finding that plaintiff was no longer disabled after June 7, 2012 the ALJ found that Dr. Perlin's treatment notes "reflect improved physical examination signs . . . ." (Tr. 210).

account of the weight assigned to the opinions of both Dr. Perlin and Dr. DeMatteo-Santa and state clearly the reasons supporting his decision.

D. CREDIBILITY ANALYSIS

The evaluation process the Commissioner has established for determining whether an individual is disabled requires the ALJ to determine whether a claimant who has a severe impairment nonetheless has the RFC to perform work available to him. 20 C.F.R. §§ 404.1520, 404.1560, 416.920, 416.960. A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account. 20 C.F.R. §§ 404.1529, 416.929; Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)(citations omitted). The ALJ is not, however, "required to accept the claimant's subjective complaints without question; he [or she] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Id.

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations: first, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, because subjective assertions of pain alone are insufficient grounds for a disability finding. Id., citing 20 C.F.R. §§ 404.1529(b), 416.929(b). If the claimant does suffer from such an impairment, at the second step the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. Here, the ALJ must consider the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms; when those claims are not substantiated by objective medical evidence, the

ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. SSR 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (S.S.A. Mar. 16, 2016). The ALJ's assessment of the credibility of a claimant is given deference by the courts, as "[i]t is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)(internal quotations and alterations omitted).

Plaintiff argues that the ALJ failed to make a direct finding on her credibility, failed to consider all indicia of credibility, and diminished her subjective complaints and testimony of pain. (Dkt. #17, Brief at 20-22). Defendant counters that "the ALJ explicitly found that plaintiff was partially credible, [in that] her credibility was intact during the period of disability, but that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible during the two periods of non-disability." (Dkt #22, Brief at 31, citing Tr. 209, 214).

While the ALJ's credibility determination is given deference, ALJ Kuperstein fails to substantively discuss plaintiff's credibility at all. As plaintiff observes, the ALJ's first remark about plaintiff's credibility is that "[t]he credibility assessment before May 2010, and since her recovery from the amputation and infection, differ as noted in the next several findings." (Tr. 209). However, the ALJ goes on to make nearly no comment about plaintiff's credibility besides conclusively determining that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [during the two periods of non-disability] are not entirely credible for the reasons stated in this decision." (Tr. 214). "[I]t is not sufficient for [an ALJ] to make a single, conclusory

statement [that the claimant's symptoms have been considered, or are not supported or consistent]." SSR 16-3p, 2016 WL 1119029, at *9; see also SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. Jul. 2, 1996).  An ALJ's determination "must contain specific reasons for the weight given to the individual's symptoms . . . and [must] be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. An ALJ's evaluation of a claimant's symptoms may be insufficient even where an ALJ makes specific references to the claimant's testimony. See Schupp, 2004 WL 1660579 at *13 (finding an ALJ's credibility reasoning insufficient, even when he articulated that it was based upon specific details of the claimant's activities, including that the claimant stays home with his children, drives, has never been hospitalized or had surgery, is able to do some grocery shopping, and has his nine-year-old cook because he cannot). In the instant case, the ALJ entirely failed to discuss plaintiff's testimony, the weight he assigned it, or the reasoning for that weight.

In fact, the only other mention of plaintiff's hearing testimony suggests it was misunderstood. The ALJ found that the plaintiff's "hearing testimony reflects that she has experienced improvement in her left foot since she has undergone the amputation of her left great toe." (Tr. 213). The ALJ provides no citation to the record for this, and the hearing transcript does not reflect that plaintiff so testified. In the only discussion in the transcript of her lower extremities during the time period after her toe amputation, plaintiff testified that she was non-weight-bearing, stumbled a lot, did not "walk too well" and had pain in her legs that she rated between a four and a ten. (Tr. 239). An ALJ's misunderstanding of a plaintiff's testimony can result in a finding of error in the ALJ's credibility analysis. In Genier, the ALJ found that plaintiff's testimony about his physical limitations was not credible because, according to the ALJ, the plaintiff had "indicated in a

questionnaire . . . that he was able to care for his dogs, vacuum, do dishes, cook, and do laundry." 606 F.3d at 50. In fact, the plaintiff had indicated that "he <u>tried</u> to care for his dogs [and do chores], but that he required the assistance of a parent for each of these tasks because of his severe fatigue." <u>Id.</u> (emphasis in original). The Second Circuit found that the ALJ's credibility determination was "based on so serious a misunderstanding of [plaintiff's] statements that it cannot be deemed to have complied with the requirement that they be taken into account." <u>Id.</u> Unlike <u>Genier</u>, the ALJ's discussion of plaintiff's testimony in the instant case did not contradict her testimony according to the transcript. However, because the only discussion of the substance of plaintiff's testimony "was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical evidence and other evidence,' and cannot stand." <u>Id.</u>, <u>citing</u> 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

Although counsel for defendant argues that the medical evidence does not corroborate plaintiff's subjective symptomology (Dkt. #22, Brief at 32-33), appellate counsel cannot rationalize the ALJ's findings after the fact. <u>Burlington</u>, 371 U.S. at 168. The ALJ has not set forth his findings, or the rationale for those findings, "with sufficient specificity to permit intelligible plenary review of the record." <u>Schupp</u>, 2004 WL 1660579 at *2 (citation omitted).   Accordingly, on remand, the ALJ will assess plaintiff's credibility consistent with this Ruling.

E. OTHER ARGUMENTS

Plaintiff argues that the ALJ erred in his evaluation of plaintiff's medical improvement (Dkt. #17, Brief at 18-20), and erred in failing to secure the testimony of a vocational expert (<u>Id.</u> at 22-23). In light of the Court's decision to remand the case for proper consideration of the medical evidence from plaintiff's treating physicians and her

52

credibility, this Court need not rule on whether the ALJ erred in his determination of medical improvement. Upon remand, the Court orders that any medical improvement be considered in light of a proper evaluation of the evidence of record.

VI. CONCLUSION

For the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner or in the Alternative Motion For Remand For A Hearing (Dkt. #17) is **denied in part and granted in part to remand**; and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #22) is **denied**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Impala v. United States Dept. Of Justice, __ F. App'x ___, 2016 WL 6787933 (2d Cir. Nov. 15, 2016)(summary order); Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated this 31st day of May, 2017 at New Haven, Connecticut.


   /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge